UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIANA AVILES, Individually and as Parent and Natural Guardian of N.A., N.A., and A.A., STEPHANIE DENARO, Individually and as Parent and Natural Guardian of D.D. and H.D., CHRISTINE KALIKAZAROS, Individually and as Parent and Natural Guardian of Y.K., GAETANO LA MAZZA, Individually and as Parent and Natural Guardian of R.L., CRYSTAL LIA, Individually and as Parent and Natural Guardian of F.L., and CHILDREN'S HEALTH DEFENSE,<br><br>      Plaintiffs,<br><br>    -against-<br><br>BILL DE BLASIO, in his Official Capacity as Mayor of the City of New York, DR. DAVID CHOKSHI, in his Official Capacity of Health Commissioner of the City of New York, NEW YORK CITY DEPARTMENT OF EDUCATION, RICHARD A. CARRANZA, in his Official Capacity as Chancellor of the New York City Department of Education, and THE CITY OF NEW YORK,<br><br>      Defendants. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>20 Civ. 9829 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

     In this action, Plaintiffs – the parents of children who attend New York City

school district elementary and middle schools, and an organization known as Children's Health

Defense – claim that the City of New York (the "City"), the Mayor and the City's Health

Commissioner, and the City's Department of Education ("DOE") and its Chancellor

(collectively, "Defendants"), have violated their rights under the United States Constitution and

New York law.  (Am. Cmplt. (Dkt. No. 11))

Plaintiffs' claims are predicated on Mayor Bill de Blasio's November 19, 2020 announcement that in-person classes in the New York City public school system would be suspended in light of the COVID-19 pandemic. (See, e.g., id. at ¶¶ 2, 8) The Mayor announced ten days later that in-person classes would resume on December 7, 2020 and December 10, 2020 – as to elementary and special needs students respectively – on the condition that parents sign a form consenting to random COVID-19 testing of their children. (Id. at ¶¶ 2-3, 9-12) On February 11, 2021, DOE announced that on February 25, 2021, in-person instruction would be extended to middle school students.[1] (See Feb. 22, 2021 Def. Ltr., Ex. R (Dkt. No. 44-4) at 1)[2]

Plaintiffs seek a mandatory injunction requiring Defendants to reopen all New York City public schools for in-person instruction. (See Proposed Order for Preliminary Injunction (Dkt. No. 32) at 2) They also seek a prohibitory injunction that would forbid Defendants "from requiring students to take mandatory COVID-19 tests as a condition for in-person education." (Id.) Stated another way, Plaintiffs seek an injunction that would prohibit Defendants from requiring parental consent to random COVID-19 testing as a condition to students attending in-person classes at New York City public schools. (See, e.g., Pltf. Br. (Dkt. No. 12) at 7, 10-11, 13-14) According to Plaintiffs, the COVID-19 pandemic presents no obstacle to in-person instruction, and Defendants' COVID-19 testing program[3] is "medically

---

[1] All references to page numbers in this opinion are as reflected in this District's Electronic Case Filing ("ECF") system.

[2] On February 8, 2021, DOE announced that its "buildings" could "now re-open . . . to students in grades 6, 7, and 8 in a manner that prioritizes health and safety," noting that 20% of students and staff would undergo weekly COVID-19 testing, and that school staff had been made eligible for vaccination. (Feb. 22, 2021 Def. Ltr., Ex. R (Dkt. No. 44-4))

[3] "The DOE in-school testing program uses a nucleic acid amplification test [("NAAT")] that involves a laboratory procedure known as [a] polymerase chain reaction (PCR) test." (Varma Decl. (Dkt. No. 19) at ¶ 40) The PCR test detects genetic material of the COVID-19 virus. (Id. at ¶ 40) A nasal swab is used to collect the necessary sample. (Id. at ¶ 54)

invasive," "unreliable," and "unconstitutional."  (Am. Cmplt. (Dkt. No. 11) at ¶ 2; see also id. at

¶ 17; Pltf. Br. (Dkt. No. 12) at 17 (providing alternative suggestions for how Defendants "can

manage the infection risk"))

    For the reasons stated below, Plaintiffs' motion for a preliminary injunction will

be denied.

## INTRODUCTION

    Plaintiffs' application comes at a critical moment in our nation's history.  We are

at war with a virus that has killed more than a half-million of our fellow citizens – more than the

total number of American soldiers killed in World War II.  See COVID Data Tracker, Centers

for Disease Control and Prevention ("CDC"), https://covid.cdc.gov/covid-data-

tracker/#cases_totaldeaths (last visited Mar. 1, 2021); see also America's Wars, Dep't of

Veterans Affs., https://www.va.gov/opa/publications/factsheets/fs_americas_wars.pdf (last

visited Mar. 1, 2021).

    January 2021 was the deadliest month of the pandemic, with this nation

seeing over six million new infections and more than 95,000 COVID-19 related deaths.  COVID

Data Tracker, CDC, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last

visited Mar. 1, 2021).  As of February 26, 2021, "[t]here has been a six-week downward trend in

cases." COVID Data Tracker Weekly Review, CDC, https://www.cdc.gov/coronavirus/2019-

ncov/covid-data/covidview/index.html (last updated Feb. 26, 2021)  However, there is concern

in the United States medical and scientific community about new variants of the virus that have

emerged – variants that are more transmissible and might be more deadly – and the efficacy of

vaccines to address these new variants.  See About Variants, CDC,

https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Feb. 12,

2021); Kelsey Lane Warmbrod, et al., <u>Staying Ahead of the Variants: Policy Recommendations to Identify and Manage Current and Future Variants of Concern</u> (Feb. 2021), Johns Hopkins Ctr. for Health Sec., <u>https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2021/20210216-covid19-variants.pdf</u>.  Indeed, the emergence of a new variant in Britain – a variant that is now in the United States (<u>id.</u>) – led to exponential growth in the number of infections and deaths in Britain in January 2021, resulting in a national lockdown and the closing of all schools.  <u>United Kingdom Coronavirus Map and Case Count</u>, N.Y. Times, <u>https://www.nytimes.com/interactive/2020/world/europe/united-kingdom-coronavirus-cases.html</u> (last updated Mar. 2, 2021).

As to vaccination, as of February 28, 2021, 7.5% of the United States population has received two doses of approved vaccines.  <u>COVID Data Tracker</u>, CDC, <u>https://covid.cdc.gov/covid-data-tracker/#vaccinations</u> (last updated Feb. 28, 2021); <u>see</u> <u>also</u> <u>U.S. Vaccination Efforts</u>, Johns Hopkins Coronavirus Res. Ctr., <u>https://coronavirus.jhu.edu/vaccines/us-states</u> (last visited Mar. 1, 2021).  The vast majority of this nation's population thus remains unprotected from the COVID-19 virus.

The virus has not spared children.  A report issued by the American Academy of Pediatrics and the Children's Hospital Association indicates that, as of February 18, 2021, more than 3.1 million "total child COVID-19 cases [have been] reported" in the United States, and that "children represent 13.1% . . . of all cases."  <u>Children and COVID-19: State-Level Data Report</u>, Am. Acad. of Pediatrics, <u>https://tinyurl.com/22a4f4mh</u> (last updated Feb. 18, 2021).  More than 70,000 new child COVID-19 cases were reported during the week of February 11, 2021 to February 18, 2021, and "there was a 6% increase in child COVID-19 cases" from February 4, 2021 to February 18, 2021.  <u>Id.</u>

Children account for approximately 1% to 3% of reported hospitalizations, and approximately 0.1% to 2.2% of children who become infected with the virus require hospitalization.  Id.  The reported death rate among children is, thankfully, quite low, but the American Academy of Pediatrics reports that 247 children have died from the virus.  Id.

While there appears to be an emerging scientific consensus that schools can be made safe for children if proper precautions are taken – including appropriate ventilation, masking, distancing, expanded screening testing, and use of hybrid attendance models, see Margaret A. Honein et al., Data and Policy to Guide Opening Schools Safely to Limit the Spread of SARS-CoV-2 Infection, J. Am. Med. Ass'n (Jan. 26, 2021), https://tinyurl.com/y6529wvf,[4] there is nothing inherently safe about the school environment.  Indeed,

> large outbreaks have occurred with apparent transmission in schools . . . [and] [p]reventing transmission in school settings will require addressing and reducing levels of transmission in the surrounding communities through policies to interrupt transmission (e.g., restrictions on indoor dining at restaurants).  In addition, all recommended mitigation measures in schools must continue[,]

---

[4]  The CDC has stated that, "[w]hen schools implement testing combined with key mitigation strategies, they can detect new cases to prevent outbreaks, reduce the risk of further transmission, and protect students, teachers, and staff from COVID-19. . . . Some schools may also elect to use screening testing as a strategy to identify cases and prevent secondary transmission.  Screening testing can be used as an additional layer of mitigation to complement mitigation strategies in schools.  Screening testing is intended to identify infected individuals without symptoms (or prior to development of symptoms) who may be contagious so that measures can be taken to prevent further transmission."  K-12 School Operation Strategy, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html (last updated Feb. 26, 2021); see id. (discussing additional mitigation strategies such as masking, distancing, handwashing, cleaning, and "contract tracing in combination with isolation and quarantine"); see also COVID-19 in children and the role of school settings in transmission – first update, European Center for Disease Prevention and Control ("ECDC") (Dec. 23, 2020), https://www.ecdc.europa.eu/sites/default/files/documents/COVID-19-in-children-and-the-role-of-school-settings-in-transmission-first-update_1.pdf; see also Transmission of SARS-CoV-2 in K-12 schools, CDC, https://tinyurl.com/knjdhd99 (last updated Feb. 12, 2021) ("For schools to provide in-person learning, associations between levels of community transmission and risk of transmission in school should be considered.  If community transmission is high, students and staff are more likely to come to school while infectious, and COVID-19 can spread more easily in schools." (footnote omitted)).

[including]: . . . expanding screening testing to rapidly identify and isolate asymptomatic infected individuals.

Id.

There is also evidence that children – particularly those ten years of age and older – are capable of transmitting the virus.  See, e.g., What We Know About COVID-19 Transmission in Schools, World Health Organization ("WHO"), https://tinyurl.com/xzrzdacn; (last updated Oct. 21, 2020); Young Joon Park et al., Contact Tracing during Coronavirus Disease Outbreak, South Korea, 2020, 26 Emerging Infectious Diseases J., 2465-2468 (Oct. 2020).  Indeed, a September 30, 2020 tracing study reports that "children and young adults [are] . . . potentially much more important to transmitting the virus – especially within households – than previous studies have identified."  Morgan Kelly, Largest COVID-19 contact tracing study to date finds children key to spread, evidence of superspreaders, Princeton Env't Inst. (Sep. 30, 2020 10:40 AM), https://www.princeton.edu/news/2020/09/30/largest-covid-19-contact-tracing-study-date-finds-children-key-spread-evidence.

Teachers and school staff have likewise suffered the ravages of the virus.  "More than 530 K-12 teachers died of covid-19 last year, according to data compiled by the American Federation of Teachers."  Meryl Kornfield, A Teacher died of covid-19. Asked to wear masks in his honor, school board members silently refused, Wash. Post (Jan. 24, 2021, 8:27 PM), https://tinyurl.com/y2w477yf.

Given these facts, many large city school districts – such as Boston, Philadelphia, Los Angeles, and San Francisco – terminated in-person learning due to the pandemic.  Certain school districts have begun or are planning to begin phased re-openings.  See, e.g., Timeline for Reopening and Phasing Additional Students to In-Person Learning, Boston Pub. Schs., https://www.bostonpublicschools.org/Page/8521 (last visited Mar. 1, 2021); Kristen A. Graham,

Philly students won't return Monday, but a reopening decision is days away, The Phila. Inquirer,

https://www.inquirer.com/news/philadelphia-school-district-reopen-hite-pft-20210225.html (last

updated Feb. 25, 2021); LA Teachers: 'No Current Plans' to Reopen Schools, CBS L.A. (Feb.

26, 2021 at 4:15 PM), https://losangeles.cbslocal.com/2021/02/26/la-schools-teachers-reopen-

utla-lausd/; Nanette Asimov and Jill Tucker, S.F. school board approves plan with labor unions

to reopen classrooms, https://www.sfchronicle.com/education/article/S-F-school-board-

approves-plan-with-labor-unions-15973439.php (last updated Feb. 24, 2021); Hannah Leone,

CPS high schools still have no reopening date. Here's how one principal is helping her students

cope in the meantime., Chi. Tribune (Feb. 20, 2021 at 5:00 AM),

https://www.chicagotribune.com/coronavirus/ct-cps-high-school-return-in-person-covid-19-

20210220-or5xkf3z3ncg3itru266s2bkga-story.html; Kate Taylor, 13,000 School Districts,

13,000 Approaches to Teaching During Covid, N.Y. Times (Jan. 21, 2021),

https://tinyurl.com/yxkatfbf.

New York City has not been spared.  Indeed, it was the early center of the

pandemic.  See, e.g., Manny Fernandez, Thomas Fuller, and Mitch Smith, 'Our New York

Moment': Southern California Reels as Virus Surges, N.Y. Times,

https://www.nytimes.com/2021/01/09/us/california-coronavirus.html (last updated Jan. 15, 2021)

(referencing New York City as the epicenter of the virus last March and April).  As of March 1,

2021, there were "at least 725,155 cases and 29,332 deaths in New York City."  New York City

Coronavirus Map and Case Count, N.Y. Times, https://tinyurl.com/y9ctka2e (last updated Mar.

1, 2021).

While the enormous toll in death and human suffering that the COVID-19 virus

has imposed on the citizens of New York City must be acknowledged, the importance of in-

person classroom learning is not in dispute here.  (See Varma Decl. (Dkt. No. 19) at ¶ 26 (noting the particular importance of in-person learning for elementary school students and students with disabilities))  It was for this reason that the schools were reopened for elementary and special needs students in December 2020, and just recently reopened for middle school students.  (Am. Cmplt. (Dkt. No. 11) at ¶¶ 2, 8-9; see also Def. Feb. 22, 2021 Ltr., Ex. R (Dkt. No. 44-4))  Defendants have, however, conditioned in-person classroom learning on parental consent to random testing for the COVID-19 virus.  (See Def. Feb. 22, 2021 Ltr., Ex. P (Dkt. No. 44-2) ("parent/guardian consent for COVID-19 testing of students shall continue to be a condition for participation by students opting for in-person learning or other in-person school activities"); Am. Cmplt., Ex. 3 (Dkt. No. 11-1) (consent form for COVID-19 testing))

Plaintiffs seek an injunction that would require Defendants to reopen all public schools to in-person instruction, and to do so without requiring parents to consent to random COVID-19 testing.  (Proposed Order for Preliminary Injunction (Dkt. No. 32) at 2)

## BACKGROUND

### I.    PARTIES

Plaintiff-Parents Amanda Aviles, Stephanie Denaro, Christine Kalikazaros, Gaetano La Mazza, and Crystal J. Lia are the parents of elementary and middle school children enrolled in New York City public schools.  (Am. Cmplt. (Dkt. No. 11) at ¶¶ 45-50; see also Aviles Decl. (Dkt. No. 12-3); Kalikazaros Decl. (Dkt. No. 12-4); La Mazza Decl. (Dkt. No. 12-5); Lia Decl. (Dkt. No. 12-6); Denaro Decl. (Dkt. No. 12-7))  Plaintiff Children's Health Defense is a national not-for-profit membership organization, with a "mission [] to safeguard children's health and to advocate for children and families to prevent and stop environmental harms and to change policies that place children at undue risk."  (Am. Cmplt. (Dkt. No. 11) at ¶ 52)

"[Children's Health Defense] has active members in New York City, including parents of children named in this lawsuit."  (Id. at ¶ 54)

Defendant Bill de Blasio is the Mayor of the City of New York and, according to Plaintiffs, "has issued a series of executive orders since the COVID-19 pandemic began, including the shutdown of New York City public schools."  (Id. at ¶ 55)  Richard A. Carranza is the Chancellor of DOE and "is responsible for enforcing education law and regulations in the City of New York."  (Id. at ¶ 56)  Defendant David Chokshi is the Commissioner for the New York City Department of Health and "provide[s] recommendations and consultation[s] to [Mayor] de Blasio and Defendant Carranza."  (Id. at ¶ 57)  Finally, Defendant DOE "has issued directives, updates and supplemental guidance on instruction for the 2020-21 school year with recommendations from the Department of Health."  (Id. at ¶ 56)

## II.     THE AMENDED COMPLAINT AND MOTION
## FOR A PRELIMINARY INJUNCTION

Although the Amended Complaint cites the "unconstitutional, arbitrary shutdown of New York City Public Schools on Thursday, November 19, 2020," Plaintiffs acknowledge that "[o]n December 7, 2020 and December 10, 2020 . . . Defendants permitted elementary and special needs children back to school."  (Id. at ¶ 2)  Accordingly, the focus of the Amended Complaint is Defendants' requirement of parental consent to "polymerase chain reaction (PCR) testing" as a prerequisite to in-person classroom instruction, and the then continued shutdown of public middle schools and high schools.  (Id. at ¶ 3; see id. at ¶ 2)  Plaintiffs contend that PCR testing is not scientifically reliable and violates the rights of both children and parents.  (See, e.g., id. at ¶¶ 5, 15-17, 21, 23, 28, 62-65)  Plaintiffs further contend that remote learning is detrimental to children.  (See, e.g., id. at ¶¶ 40-44)

Plaintiffs claim that Defendants have violated their right to (1) procedural and substantive due process, and equal protection, under the Fourteenth Amendment; and (2) be free from unreasonable searches and seizures, and their right to privacy, under the Fourth Amendment.  (See id. at ¶¶ 66-76 (First Claim for Relief); id. at ¶¶ 77-82 (Second Claim for Relief); id. at ¶¶ 83-92 (Third Claim for Relief); id. at ¶¶ 104-110 (Sixth Claim for Relief); id. at ¶¶ 111-116 (Seventh Claim for Relief); id. at ¶¶ 117-120 (Eighth Claim for Relief))  Plaintiffs also raise claims under the New York Constitution, Article XI, Section I, New York Public Health Law §§ 2240 et seq., and New York City Parents' Bill of Rights.  (Id. ¶¶ 99-103 (Fifth Claim for Relief); id. at ¶¶ 121-125 (Ninth Claim for Relief); id. at ¶¶ 126-137 (Tenth Claim for Relief))  Finally, Plaintiffs contend that Defendants have violated their right to direct the education of their children.  (Id. at ¶¶ 93-98 (Fourth Claim for Relief))

In moving for a preliminary injunction, Plaintiffs ask this Court to "restore [Plaintiffs'] children's ability to return to full-time in-school instruction, K-12th grade, without the unethical and illegal requirement of coerced medical testing."  (Pltf. Br. (Dkt. No. 12) at 7)  In other words, Plaintiffs ask this Court to "void Defendants' continued partial and full school closures of grades K-12 and to enjoin their forced medical testing of students."  (Id.)

### 1.     Plaintiffs' Factual Allegations

Plaintiffs contend that "[c]hildren are at extremely low risk from COVID-19," (Id. at 8) and that "the infection fatality rate for people aged 0-19 years is .00003."  (Id. at 9 (citing Am. Cmplt., Ex. 12 (Dkt. No. 11-2) (CDC post, updated on September 10, 2020, entitled "Covid-19 Pandemic Planning Scenarios")))  According to Plaintiffs, "children are the least likely group in society to become ill from COVID or to transmit disease."  (McKernan Decl.

(Dkt. No. 12-2) at ¶ 28 (Ex. 7, CDC post, updated on September 10, 2020, entitled "Covid-19

Pandemic Planning Scenarios"))

Plaintiffs further claim that "[t]he short- and long-term academic, psychological

and emotional burdens children suffer from school exclusion outweigh the risks of COVID-19."

(Pltf. Br. (Dkt. No. 12) at 8)  According to Plaintiffs,

> Defendants can manage the infection risk to teachers by offering them choices
> and providing them protection, as employers do for other essential workers.
> Defendants did this September through November 2020, before the November 19,
> 2020 shutdown, offering teachers remote options, fewer students per class, plastic
> barriers, masks, temperature taking and other protection measures.  Teachers' risk
> mitigation cannot come at the expense of children's education.

(Id. at 17)

As to Defendants' requirement that parents seeking in-person learning for their

children consent to random PCR testing, Plaintiffs assert that Defendants' PCR testing program

is "coerce[d]," and presents "parents with a Hobson's choice:  put your child in isolated, inferior

remote learning for at least ten more months . . . or subject her to intrusive, unwanted medical

procedures."  (Id. at 10)  According to Plaintiffs, Defendants "mandatory PCR tests" are

invasive, unreliable, are not diagnostic, and serve no useful purpose.  (Id. at 9; see also id. at 8-

10, 14, 17)  Indeed, Plaintiffs contend that "97% of PCR positives tests may actually be false."

(Id. at 9)

Finally, Plaintiffs assert that "[t]he National Institutes of Health (hereinafter

"NIH") has determined that PCR testing is not the 'Gold Standard' of COVID-19 diagnosis as it

is widely touted to be.  NIH acknowledges that '[t]his RT [reverse transcription] PCR may

increase the positivity rate, depending on the number of repetitions of this test.'"  (Id. at 10

(citing Am. Cmplt., Ex. 20 (Dkt. No. 11-2)))

11

In support of these arguments, Plaintiffs submit the declaration of Dr. Sin Hang Lee, a pathologist who previously worked at Milford Hospital, and who currently operates the Milford Molecular Diagnostics Laboratory in Milford, Connecticut. (Lee Decl. (Dkt. No. 12-1) at ¶ 1); Lee Decl., Ex. 1 (Dkt. No. 12-1) (Curriculum Vitae)) According to Dr. Lee, "the current tests to detect SARS-CoV-2 RNA are generating false positives and negatives," and "a two-phased test with DNA sequencing [that he has developed] would 'guarantee no-false positive results[.]'"[5] (Lee Decl. (Dkt. No. 12-1) at ¶ 6; see id. at ¶¶ 7, 22) Dr. Lee further asserts that the "[c]urrent PCR testing detects virus genome-related materials 'long after the infected person has stopped transmitting the virus.'" (Id. at ¶ 17) "To have children take such an unreliable test is . . . absurd." (Id. at ¶ 24) Dr. Lee also argues that the PCR test "would be quite easy and simple to manipulate," such that "the number of positive results" could be inflated. (Id. at ¶ 20)

---

[5] In a March 22, 2020 letter to the World Health Organization ("WHO") and Dr. Anthony Fauci – the director of the National Institute of Allergy and Infectious Diseases at NIH – Dr. Lee presented his criticisms of the PCR test and offered his laboratory's "Sanger sequencing" test as a solution. (Lee Decl. (Dkt. No. 12-1) at ¶¶ 6-8; Lee Decl., Ex. 2 (Dkt. No. 12-1) (March 22, 2020 letter)) Dr. Lee asked the WHO and Dr. Fauci to "[p]lease inform your affiliated laboratories that we are now in a position to assist them to resolve their questionable RT-qPCR test results." (Lee Decl., Ex. 2 (Dkt. No. 12-1) at 20) In his declaration, Dr. Lee states that "it is almost unbelievable that . . . [he has] received no response from either the WHO or [the] NIH." (Lee Decl. (Dkt. No. 12-1) at ¶ 8)

In 2018, Dr. Lee sued the CDC in connection with a similar "nested PCR/DNA sequencing-based diagnostic technology." Sin Hang Lee, M.D. v. United States, 142 Fed. Cl. 722, 727 (2019) (citation and quotation marks omitted). In that lawsuit, Dr. Lee alleged that the CDC had breached an "implied-in-fact contract" with him to endorse Dr. Lee's "sequencing-based molecular test to diagnose Lyme disease," which Dr. Lee argued was "significantly more accurate than any other test currently used." Id. at 726 (citation and quotation marks omitted). Dr. Lee further alleged that the CDC had "engaged in anti-competitive conduct and defamed him by making certain false statements regarding the results of the sequencing-based molecular test." Id. The Court of Federal Claims granted the Government's motion to dismiss Dr. Lee's breach of contract claim, finding that he had not pled sufficient facts to allege the existence of a contract. Id. at 730. The court dismissed Dr. Lee's tort and antitrust claims for lack of subject matter jurisdiction. Id.

According to Dr. Lee, PCR "test kit manufacturers [have a motive] to please their customers whose business benefits from a high number of COVID-19 cases."  (Id.)

Plaintiffs have also submitted a declaration from Kevin McKernan.  (McKernan Decl. (Dkt. No. 12-2))  McKernan is the chief scientific officer of Medicinal Genomics Corp., where he focuses on the study of cannabis-based therapeutics.  (McKernan Decl., Ex. 1 (Dkt. No. 12-2))  McKernan has a bachelor of science degree from Emory University.  (McKernan Decl., Ex. 2 (Dkt. No. 12-2))  McKernan repeats Dr. Lee's criticism that "PCR testing cannot test for viral infectiousness or illness," and that "[p]atients can be qPCR positive for 77 days post infection."  (McKernan Decl. (Dkt. No. 12-2) at ¶ 14)  Because "[t]he infectious period of [the COVID-19] virus is only 7-10[]days" (id. at ¶ 15), "PCR positivity exists weeks to months past infectiousness."  (Id. at ¶ 18 (citing Ex. 4))  Accordingly, "the majority of positive students will be falsely quarantined by this test."  (Id. at ¶ 15)  McKernan also complains that because Defendants destroy samples after parents receive the results, it is "impossible for families to challenge the accuracy of testing, thus making the test 'irrefutable.'"  (Id. at ¶ 23)

McKernan argues that – instead of pursuing a random testing program – Defendants should (1) perform "[t]emperature testing" – which he regards as "a better solution and less invasive" (id. at ¶ 34); and (2) "simply require [that] symptomatic people stay home."  (Id. at ¶ 35)

## DISCUSSION

### I.   FACTUAL FINDINGS

#### A.   Impact of the COVID-19 Virus on Public Health

The COVID-19 virus has had a devastating impact on New York City, and has presented public health concerns not seen in a hundred years.  In March and April 2020, New York City became the national epicenter of the COVID-19 pandemic, and in subsequent months, the City saw exponential growth in infections and deaths.  (See Varma Decl. (Dkt. No. 19) at ¶ 7 ("As of May 13, 2020, New York City, with over 20,000 confirmed or probable COVID-19 deaths, had the sixth highest number of reported COVID-19 deaths as compared to any country in the world." (emphasis omitted));  COVID-19 Email Update, Johns Hopkins Ctr. for Health and Sec. (May 20, 2020) https://myemail.constantcontact.com/COVID-19-Updates---May-20.html?soid=1107826135286&aid=CBH5s4rQyjw ("New York state and New York City have reported steadily increasing tests since late March and steadily decreasing incidence since mid-to-late April, an encouraging sign from the hardest-hit area of the country."); Eric Toner et al., Crisis Standards of Care: Lesson from New York City Hospitals' COVID-19 Experience The Emergency Medicine Perspective (Feb. 2021), Johns Hopkins Ctr. for Health Sec., https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2021/210223-NYC-CSC-ER.pdf ("New York City suffered an unprecedented surge of patients with . . . COVID-19 from April to June 2020. . . . Hospitals were overwhelmed and unable to maintain conventional standards of care, forcing hospitals and healthcare workers to adjust the way that care was provided in order to do the most good for the greatest number of patients."))

Infection rates, hospitalizations, and deaths all decreased substantially over the summer, but by September 2020, the City saw a resurgence of the virus.  (Varma Decl. (Dkt. No.

19) at ¶ 8)  Ultimately, exponential growth in infection rates, hospitalizations, and deaths

returned.  (Id. at ¶ 9 ("On September 24th, the daily average for new cases was 352, a 50%

increase in cases over 45 days.  It then took only 12 days to increase another 50% to 527 cases

on October 6th. . . . On December 15th[,] the daily average for new cases was 3,684, a more than

ten-fold increase since September 24th."))  "The positivity rate is an important indicator of the

degree of community spread[,] . . . [because it] measures the percent of COVID-19 laboratory

tests that have a positive result.  The average daily positivity rate in New York City . . . was

1.2%[] on August 10th. . . .  On December 15th, the positivity rate was 6.21%."  (Id. at ¶ 11

(footnote omitted))  "As of December 21, 2020, New York City ha[d] sustained a total of 24,735

deaths (19,984 confirmed and 4,751 probable), 66,021 hospitalizations and 387,361 cases of

COVID-19 (348,0991 confirmed and 39,270 probable)."  (Id. at ¶ 14)

   "COVID-19 is most commonly transmitted by small viral particles exhaled by an

infected person that are deposited into the nose, mouth, and/or eyes of an uninfected person."

(Id. at ¶ 6; see also Ways COVID-19 Spreads, CDC, https://www.cdc.gov/coronavirus/2019-

ncov/prevent-getting-sick/how-covid-spreads.html (last updated Oct. 28, 2020))  Approved

treatments for the COVID-19 virus are still quite limited.  See, e.g., Coronavirus (COVID-19)

Update: FDA Authorizes Monoclonal Antibodies for Treatment of COVID-19, U.S. Food &

Drug Administration ("FDA") (Feb. 9, 2021), https://tinyurl.com/k62yznd5 (discussing the

emergency use authorization issued for bamlanivimab and etesevimab); see also Potential

Treatments, CDC, https://www.cdc.gov/coronavirus/2019-ncov/your-health/treatments-for-

severe-illness.html (last updated Dec. 8, 2020).  The CDC, the WHO, and other infectious

disease experts have suggested a variety of measures to combat the spread of the virus, including

wearing masks, washing hands, social distancing, isolation and quarantining, and vaccination.

(See, e.g., Protect Yourself, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last updated Feb. 4, 2021); Coronavirus disease (COVID-19) advice for the public, WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public (last updated Feb. 24, 2021); When to Quarantine, CDC, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (last updated Feb. 11, 2021); Varma Decl. (Dkt. No. 19) at ¶ 6)

Throughout the pandemic, public health authorities have implemented measures designed to protect the hospital system from becoming overwhelmed by COVID-19 patients. (Varma Decl. (Dkt. No. 19) at ¶ 16; see also Community Mitigation Framework, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html (last updated Feb. 16, 2021); COVID-19 Micro-Cluster Strategy, N.Y. State: N.Y. Forward, https://forward.ny.gov/ (last visited Mar. 1, 2021) ("New rules and restrictions directly target areas to help control COVID-19 spread and protect hospital capacity"))

Although the medical evidence indicates that children infected with the COVID-19 virus are less likely than adults to be symptomatic and to develop severe symptoms, children are not immune, and certain children infected with the virus have suffered multisystem inflammatory syndrome (MIS-C), which can cause serious heart problems and require hospitalization.  (Varma Decl. (Dkt. No. 19) at ¶ 18; COVID-19 in Children and Teens, CDC, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/children/symptoms.html (last updated Feb. 26, 2021))

In New York City – as of December 21, 2020 – for children between the ages of 0-17, there were "19 deaths from COVID-19 . . . (16 confirmed by positive COVID-19 test and 3 probable).  As of December 3, 2020, there [were] 16,947 cases of COVID-19 among children . . .

and 742 hospitalizations." (Varma Decl. (Dkt. No. 19) at ¶ 19; see also COVID-19: Data, N.Y.C. Health, https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page#deaths (last visited Mar. 1, 2021)

In New York City, as of December 5, 2020, "the average positivity rate for children between the ages of 0-4, was 7.02%, for children between the ages of 5-12 it was 6.88% and for children between the ages of 13-17 it was 8.28%." (Varma Decl. (Dkt. No. 19) at ¶ 19; see also COVID-19: Data, N.Y.C. Health, https://www1.nyc.gov/site/doh/covid/covid-19-data.page (last visited Mar. 1, 2021)) According to the American Academy of Pediatrics, as of February 25, 2021, more than 3.1 million children in the United States have tested positive, "which is 13.1% of total cumulated cases in states reporting cases by age." (See Children and COVI-19: State Level Data Report, Am. Acad. of Pediatrics, https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/ (last updated Feb. 25, 2021); see also Varma Decl. (Dkt. No. 19) at ¶ 20 (noting that "the number of new cases [in children] increased by 25% in the . . . period [between December 3 and December 17, 2020]") At least one large study has shown that while children of all ages can transmit the COVID-19 virus, transmission rates are low for children under the age of 10, whereas children over 10 may transmit COVID-19 as efficiently as adults. (Young Joon Park et al., Contact Tracing during Coronavirus Disease Outbreak, South Korea, 2020, 26 Emerging Infectious Diseases J., 2465-2468 (Oct. 2020); see also Varma Decl. (Dkt. No. 19) at ¶ 21)

### B. School District Response to the Pandemic

Decisions concerning in-person classroom learning must be premised on the level of community transmission of COVID-19 and the ability to implement appropriate mitigation

17

measures to protect students, teachers and other staff.  See K-12 Operational Strategy, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html (last updated Feb. 26, 2021); Margaret A. Honein et al., Data and Policy to Guide Opening Schools Safely to Limit the Spread of SARS-CoV-2 Infection, J. Am. Med. Ass'n (Jan. 26, 2021), https://tinyurl.com/y6529wvf.

Here in New York City, public schools were closed to in-person learning between March 16, 2020 and October 1, 2020.  See New York City to Close All School Buildings and Transition to Remote Learning, N.Y.C., Office of the Mayor (March 15, 2020), https://tinyurl.com/4um7mz6e; 2020-2021 School Year Calendar, N.Y.C. Dep't of Ed., https://www.schools.nyc.gov/about-us/news/2020-2021-school-year-calendar (last visited Mar. 1, 2021).  By the fall of 2020, however, Defendants offered in-person learning as part of a hybrid learning model.  (Varma Decl. (Dkt. No. 19) at ¶ 22)  "Almost two-thirds of the parents of DOE students (63%), chose 100% remote learning for their children," however.  (Chou Decl. (Dkt. No. 18) at ¶ 11)

In the fall, Defendants initially decided to switch to an entirely remote learning model if the seven-day average positivity rate in the City – the percent of COVID-19 laboratory tests that have a positive result – rose to 3%.  (Varma Decl. (Dkt. No. 19) at ¶ 23; see also Transcript: Mayor de Blasio Holds Media Availability, N.Y.C., Office of the Mayor (Nov. 19, 2020), https://www1.nyc.gov/office-of-the-mayor/news/794-20/transcript-mayor-de-blasio-holds-media-availability (addressing the 3% standard))  Positivity rate is, of course, an important indicator of community spread.  (Varma Decl. (Dkt. No. 19) at ¶ 11)  As the positivity rate increases, the increase in rates of infection may move from linear to exponential growth.  (Id. at ¶

23)  The City reached the 3% threshold on November 18, 2020, and on November 19, 2020,

public schools were closed to in-person learning.  (Id.)

New York State and New York City subsequently developed protocols for school

reopenings.  These protocols are premised on rates of infection.  (See Varma Decl. (Dkt. No. 19)

¶¶ 24-25, 30-31, 33-39)  New York State has a Cluster Action Initiative – a program that

"divide[s] clusters and the areas around them into three categories with successively higher

restrictions within each one."  Cluster Action Initiative, N.Y. State: N.Y. Forward,

https://forward.ny.gov/cluster-action-initiative (last visited Mar. 1, 2021).  The State program

details restrictions for various activities in the color-coded zones of red, orange, and yellow.  Id.

For example, in the yellow zone[6] – schools can remain open with "20% weekly testing of in-

person students and faculty."  Id.  As of January 27, 2021, the Bronx had two yellow zones,

while Manhattan and Queens each had one yellow zone.  See COVID-19 Zone Finder, N.Y.C.,

https://nycgov.maps.arcgis.com/apps/instant/lookup/index.html?appid=021940a41da04314827e2

782d3d1986f  (last updated Jan. 28, 2021).

DOE has developed protocols for handling classroom outbreaks of the virus.

These protocols are premised on the number of confirmed cases in a classroom or school, and

---

[6]  "A geographic area will be eligible to enter a Yellow Zone if it has a 3 percent positivity rate
(7-day average) over the past 10 days and is in the top 10 percent in the state for hospital
admissions per capita over the past week and is experiencing week-over-week growth in daily
admissions."  Cluster Action Initiative, N.Y. State: N.Y. Forward, https://forward.ny.gov/cluster-
action-initiative (last visited Mar. 1, 2021).  While schools in red and orange zones previously
were subject to closure, they may now remain open subject to certain conditions, including
random testing of in-person students, faculty and staff.  Interim Guidance on COVID-19 Testing
Requirements for Public and Non-Public Schools Located in Areas Designated as "Red" or
"Orange" Cluster Zones Under the New York State Cluster Action Initiative, N.Y. State Dep't of
Health,
https://coronavirus.health.ny.gov/system/files/documents/2020/12/guidanceforschoolsinredandor
angezones.pdf (last updated Dec. 4, 2020); see id. (detailing testing options).

whether the cases appear to be linked.  Health and Safety, N.Y.C. Dep't of Educ.,

https://www.schools.nyc.gov/school-year-20-21/return-to-school-2020/health-and-safety (last

visited Mar. 1, 2021).  Where "[a]t least two cases" are "linked together" and come from the

same classroom, that classroom – having transitioned to remote learning while the cases were

being investigated – will "remain[] closed for 10 days; students and staff in close contact with

positive case [will] quarantine for 10 days."  Id.  Where "[a]t least two cases" are "linked

together" but come from "different classrooms," both classrooms will be closed during the

investigation and will "remain closed and quarantined for 10 days."  "Additional school

members" will be "quarantined based on where the exposure" occurred.  Id.

C.     **Defendants' PCR Random Testing Protocols**

The purpose of Defendant's in-school testing program is three-fold:  to determine

whether the COVID-19 virus is present in the individual randomly selected for testing; to control

the disease in the school population; and to monitor the prevalence of the COVID-19 virus in the

school population.  (Varma Decl. (Dkt. No. 19) at ¶ 46)

As discussed above, Defendants "in-school testing program uses a nucleic acid

amplification test that involves a laboratory procedure known as [a] polymerase chain reaction

(PCR) test."  (Id. at ¶ 40; see also generally COVID-19 Testing for Students and Staff, N.Y.C.

Dep't of Ed., https://www.schools.nyc.gov/school-year-20-21/return-to-school-2020/health-and-

safety/covid-19-testing (last visited Mar. 1, 2021))

Students, teachers, and staff are randomly selected for testing.  (Varma Decl.

(Dkt. No. 19) at ¶ 52)  If a child is selected for testing, parents are notified two days in advance

of the test.  (Id. at ¶ 56)  If a student selected for testing expresses anxiety or discomfort with the

test on the scheduled day of testing, the student will not be tested at that time and a parent will be

contacted.  (Id. at ¶ 55)  Testing is performed by trained personnel in the presence of school staff.

(Id. at ¶ 53)  A short nasal swab is used to collect a sample; the naso-pharyngeal swab, or "long

swab," is not used.  (Id. at ¶ 54)  Obtaining a sample from each nostril is done within a matter of

seconds and is not painful.  (Id.)  Parents are notified both that their child has been tested and of

the results.[7]  (Id. at ¶ 56; see also Jan. 14, 2021 Tr. (Dkt. No. 34) at 19-21)  In the event of a

positive test, the child would remain out of school and in quarantine for ten days.  (See, e.g., Jan.

14, 2021 Tr. (Dkt. No. 34) at 23-24; see also Health and Safety, N.Y.C. Dep't of Ed.,

https://www.schools.nyc.gov/school-year-20-21/return-to-school-2020/health-and-safety ("In the

event that there is a laboratory- confirmed case in a school, all students and teachers in that class

are assumed close contacts and will be instructed to self-quarantine for 10 days since their last

exposure to that case. . . . Whenever a student is quarantining at home, the expectation is that

they continue engaging with learning remotely if they are feeling well enough.") (last visited

Mar. 1, 2021); COVID-19: Understanding Quarantine and Isolation, N.Y.C. Dep't of Health

https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-understanding-quarantine-and-

isolation.pdf (last visited Mar. 1, 2021) (explaining the difference between quarantine and

isolation and that the period for both should be at least ten days from certain described start

points); Feb. 22, 2021 Def. Ltr., Ex. S (Dkt. No. 44-5) at 28 (CDC guidance entitled

"Operational Strategy for K-12 Schools through Phased Mitigation," noting that "[f]or students,

teachers, and staff who had previously received positive test results and do not have symptoms of

---

[7]  Results are also provided to the New York City Test & Trace Corps, which performs New
York City's contact tracing program, and to the New York City Department of Health and
Mental Hygiene and the New York State Department of Health.  (Varma Decl. (Dkt. No. 19) at ¶
60)  "No information about the COVID-19 test results for individual students is made publicly
available."  (Id. at ¶ 61)

COVID-19, retesting is not recommended for up to 3 months from their last positive test result.”))

Children as young as six years old may be randomly selected for testing.  (See Jan. 14, 2021 Tr. (Dkt. No. 34) at 19)  Testing will only be conducted on a child if parents have submitted an executed consent form.  “If a parent does not provide the consent form, then the child continues with 100% remote learning.”  (Varma Decl. (Dkt. No. 19) at ¶ 49 (footnote omitted))  Parental consent to testing may be withdrawn at any time.  (Id. at ¶ 51)  Parents may seek exemption from testing requirements for medical reasons and behavioral disabilities that make testing in school unsafe. (Id. at ¶ 50; see also Chou Decl. (Dkt. No. 18) at ¶ 19)

Random testing in New York City public schools has been conducted since the fall, and beginning on December 7, 2020, the City “increase[d] the frequency of testing performed from once per month to once per week.”  (Varma Decl. (Dkt. No. 19) at ¶ 25; see id. at ¶ 52 (“Twenty percent (20%) of the students and staff will be tested each week.”)) Accordingly, by now, a great number of children in the New York City public school system have already been tested.  (Jan. 14, 2021 Tr. (Dkt. No. 34) at 20)

The in-school testing is performed “on a single day, in the school building, and by one provider,” to “ensure consistency and timeliness of reporting across DOE schools” citywide. (Varma Decl. (Dkt. No. 19) at ¶ 45; see id. (“Experience has shown that when testing is performed by outside providers, such as individual doctors or urgent care offices, different tests and specimen collection procedures may be used, which can vary in accuracy and can vary substantially in the time to receive the results.”))  All vendors used for the in-school testing program sign non-disclosure agreements, so as to “maintain all personally identifiable information in a secure, confidential manner.”  (Id. at ¶ 57)

Defendants utilize "two laboratories that provide trained teams to collect the specimens at DOE schools and analyze the specimens using an RT-PCR test."  (Id. at ¶ 43) "Each laboratory has obtained an Emergency Use Authorization from the FDA to perform RT-PCR testing for COVID-19."  (Id. (footnotes omitted))

Once the PCR tests are completed, the specimens are discarded.  (Id. at ¶ 58; see id. ("The specimens are only tested for the virus (SARS-CoV-2) that causes COVID-19.  Once the tests have been successfully completed, the specimens are discarded.  No information about the DNA of the individual being tested is analyzed, stored or used during the testing.  The test involves the extraction of the virus' RNA and testing using the standard, FDA authorized methods described earlier."))[8]

**D.     Reliability and Usefulness of the PCR Test**

Plaintiffs contend that Defendants should be enjoined from requiring parental consent to random PCR testing because the PCR test is unreliable and cannot reveal whether the subject of the test is currently infectious – i.e., capable of transmitting the COVID-19 virus.  (See

---

[8]  On December 24, 2020, in Michael Kane et al. v. New York City Department of Education, Index No. 160831-2020E (N.Y. Sup. Ct.), DOE entered into a settlement agreement providing that all testing samples from Defendants' COVID-19 testing program would be destroyed.  (See Varma Decl., Ex. B (Dkt. No. 19-2) at ¶ 1 ("Stipulation of Settlement and Discontinuance," in which "Respondent, New York City Department of Education . . . hereby certifies and assures that each and every vendor involved in the collection, storage and analysis of COVID-19 specimens collected in [its] schools shall destroy these specimens after completion of the testing protocols and/or after clinical reports are issued and shall not replicate or make any other use of said specimens.  Such specimens may not be used for any purpose other than for the COVID-tests."))  Petitioners in Kane – parents of DOE students and DOE teachers and professional staff – sued to prevent implementation of the COVID-19 testing program unless DOE agreed that test specimens would not be used for any other purpose and would be destroyed after the test was performed.  (See Jan. 23, 2021 Def. Ltr., Ex. A (Dkt. No. 37-1) (Petition))  Stephanie Denaro – a Plaintiff in the instant case – was one of the petitioners in Kane.  (Id.)

Pltf. Br. (Dkt. No. 12) at 7-8, 17; Lee Decl. (Dkt. No. 12-1) at ¶¶ 17-19; McKernan Decl. (Dkt. No. 12-2) at ¶¶ 14-16; Jan. 14, 2021 Tr. (Dkt. No. 34) at 8)

There is broad consensus in the medical and scientific community that the PCR test is a reliable indicator of the presence of the COVID-19 virus in a subject.  (See, e.g., Using Antigen Tests, CDC, https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antigen-tests-guidelines.html (last updated Dec. 16, 2020) ("The 'gold standard' for clinical diagnostic detection of SARS-CoV-2 remains NAATs, such as RT-PCR.  Thus, it may be necessary to confirm an antigen test result with a nucleic acid amplification test, especially if the result of the antigen test is inconsistent with the clinical context."); Feb. 22, 2021 Def. Ltr., Ex S (Dkt. No. 44-5) at 3, 28 (CDC "Operational Strategy for K-12 Schools through Phased Mitigation" release,which recommends the "prioritiz[ation] [of] tests with highly accurate results with high sensitivity and specificity such as NAATs"); Jan. 23, 2021 Def. Ltr., Ex. H (Dkt. No. 37-17) at 5 (WHO interim guidance from September 11, 2020, "Diagnostic testing for SARS-CoV-2," which states that, "[w]herever possible, suspected active SARS-CoV-2 infections should be tested with NAAT, such as rRT-PCR"); Jan. 23, 2021 Def. Ltr., Ex. I (Dkt. No. 37-18) at 2-4 (FDA overview entitled "A Closer Look at Covid-19 Diagnostic Testing," which notes that molecular tests – such as NAATs – are highly sensitive and highly specific))

The Court concludes that the PCR test is highly accurate in determining the presence of the COVID-19 virus.  Indeed, the PCR test is currently the best indicator of COVID-19 infection that is available for mass, routine use.  (Id.; see also Test for Current Infection, CDC, https://www.cdc.gov/coronavirus/2019-ncov/testing/diagnostic-testing.html (last updated Feb. 19, 2021) ("A viral test checks specimens from your nose or your mouth (saliva) to find out if you are currently infected with SARS-CoV-2, the virus that causes COVID-19. . . . [NAATs]

detect the virus's genetic material and are commonly used in laboratories.  NAATs are generally

more accurate, but sometimes take longer to process than other test types.").

   Plaintiffs are correct, however, in asserting that the PCR test does not reveal

whether the subject is currently infectious.  (See Varma Decl. (Dkt. No. 19) at ¶ 65 ("There

currently is no test routinely available to determine whether individuals are infectious."); see also

Lab FAQs, CDC, https://www.cdc.gov/coronavirus/2019-ncov/lab/faqs.html (last updated Feb.

25, 2021) (responding to the question, "[c]an a diagnostic RT-PCR test show how infectious

someone is," and providing the answer "No. RT-PCR tests are used to identify and diagnose an

active infection but cannot be used to show how infectious someone is.")) The PCR test merely

indicates whether genetic material of the virus is then present in the subject.  See COVID-19

diagnostic testing, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/covid-19-

diagnostic-test/about/pac-20488900 (last visited Mar. 1, 2021) (noting that PCR tests "detect[]

genetic material of the virus").

   Plaintiffs argue that it is "absurd" to require a student who has received a positive

test to be quarantined, when the student may not be capable of transmitting the virus to someone

else.  (Ptf. Br. (Dkt. No. 12) at 8-9; Lee Decl. (Dkt. No. 12-1) at ¶ 22-24; McKernan Decl. (Dkt.

No. 12-2) at ¶¶ 15, 18; Jan. 14, 2021 Tr. (Dkt. No. 34) at 32)

   In an ideal world – which this assuredly is not – a test for current infectiousness

would be readily available.  Defendants have asserted, however – without contradiction from

Plaintiffs – that "[t]here currently is no test routinely available to determine whether individuals

are infectious; to make that assessment, laboratories must perform a challenging procedure

known as viral culture, which requires highly specialized biocontainment facilities that are

largely restricted to federal government or academic research laboratories."  (Def. Br. (Dkt. No.

17) at 13; see also Varma Decl. (Dkt. No. 19) at ¶¶ 62-65; Jan. 23, 2021 Def. Ltr. (Dkt. No. 37) at 2)  In a world in which no test is readily available for current infectiousness, a test that reliably indicates the presence of the COVID-19 virus is of great value.

Plaintiff's declarations to the contrary – from Dr. Lee and Keven McKernan – are not persuasive.  As discussed above, there is a scientific consensus that the PCR test is highly accurate for purposes of determining the presence of the COVID-19 virus.  Indeed, the CDC, the WHO, and public health organizations throughout the world rely on the PCR test to diagnose the presence of the virus.  (See, e.g., Jan. 23, 2021 Def. Ltr., Ex. E (Dkt. No. 37-14) at 2 (CDC "Interim Considerations for Testing K-12 School Administrators and Public Health Officials" release; describing molecular testing – such as the PCR test – as the "gold standard" for detecting COVID-19); Jan. 23, 2021 Def. Ltr., Ex. F (Dkt. No. 37-15) at 1 (ECDC "Diagnostic Testing and Screening for COVID-19" release; describing the PCR test as the "gold standard" "for diagnosing suspected cases of COVID-19"))

Moreover, as Plaintiffs conceded at oral argument, their claim that the NIH has stated that the PCR test is unreliable is false.  (Jan. 14, 2021 Tr. (Dkt. No. 34) at 12-13)[9]  While it is true that the PCR test cannot determine whether an individual is currently infectious, Defendants have asserted that no such test is now available for mass use.  (Varma Decl. (Dkt. No. 19) at ¶ 65)  Plaintiffs could not refute this assertion at oral argument, and stated that they would address it in a subsequent written submission.  (Jan. 14, 2021 Tr. (Dkt. No. 34) at 9-11) Although Plaintiffs have made several submissions since oral argument (Jan. 15, 2021 Pltf. Ltr.

---

[9]  At oral argument, Plaintiffs conceded that in their brief and in the Amended Complaint (see Am. Cmplt., Ex. 20 (Dkt. No. 11-2); Pltf. Br. (Dkt. No. 12) at 10) – they improperly cited a letter to the editor of a medical journal as proof that the NIH had determined that the PCR test is unreliable.  (Jan. 14, 2021 Tr. (Dkt. No. 34) at 13 ("Your Honor, that may be the weakest part of our argument and I do apologize for making it."))

(Dkt. No. 33); Jan. 23, 2021 Pltf. Ltr. (Dkt. No. 38); Feb. 17, 2021 Pltf. Ltr. (Dkt. No. 42); Feb.

22, 2021 Pltf. Ltr. (Dkt. No. 45)), none have addressed the availability of a test to determine

infectiousness.

As to Dr. Lee's "Sanger sequencing" test, as Plaintiffs acknowledged at oral

argument, no public health authority has adopted that test.  (Jan. 14, 2021 Tr. (Dkt. No. 34) at 9-

10)  Finally, Dr. Lee's suggestion that testing labs are manipulating PCR tests to increase the

number of positive tests (Lee Decl. (Dkt. No. 12-1) at ¶ 20) is rank speculation.[10]

As to Kevin McKernan, he lacks the medical and scientific background necessary

to offer an informed opinion about the issues raised in this action.  And as with Dr. Lee,

McKernan provides no evidence suggesting that Defendants have incorrectly asserted that there

is no practical way – on a mass basis – to test for infectiousness.  The alternatives to random

testing offered by McKernan are implausible on their face.  For example, he recommends

"temperature testing," and a policy requiring that symptomatic individuals stay home.

(McKernan Decl. (Dkt. No. 12-2) at ¶¶ 34-35)  But given that as many as 45% of infected

individuals are asymptomatic (Berkeley Lovelace Jr., Dr. Anthony Fauci says WHO's remark on

asymptomatic coronavirus spread 'was not correct', CNBC,

https://www.cnbc.com/2020/06/10/dr-anthony-fauci-says-whos-remark-on-asymptomatic-

coronavirus-spread-was-not-correct.html (updated June 10, 2020) (quoting Dr. Fauci as saying,

"'In fact, the evidence we have given the percentage of people, which is about 25% [to] 45%, of

the totality of infected people likely are without symptoms . . . [a]nd we know from

epidemiological studies that they can transmit to someone who is uninfected even when they are

---

[10]  Dr. Lee's recent unsuccessful litigation against the CDC – which involved a variant of his
sequencing technology – and his unhappiness about the CDC's failure to respond to his proposal
to perform COVID-19 tests for the agency, provide further reasons to distrust his opinions here.

without symptoms.'")), McKernan's assertion that an approach premised on "temperature testing" of symptomatic individuals is all that is necessary to control the virus in the public schools is deeply flawed.  Indeed, implementation of McKernan's suggested approach would be reckless.  Finally, as to McKernan's complaint that Defendants destroy PCR test samples (McKernan Decl. (Dkt. No. 12-2) at ¶ 23), this policy is the result of the <u>Kane</u> action – discussed above – in which one of the Plaintiffs in the instant case successfully sued to require Defendants to destroy test specimens.  (<u>See</u> Jan. 23, 2021 Def. Ltr., Ex. A (Dkt. No. 37-1) (<u>Kane</u> petition))

*       *       *       *

The Court concludes that a phased reopening of public schools in New York City is appropriate in light of the havoc wreaked by the COVID-19 virus and the medical and scientific evidence discussed above.  With respect to Defendants' requirement that parents consent to random COVID-19 testing of their children – as a prerequisite to in-person learning – the Court finds that (1) children are at risk from the COVID-19 virus; (2) children are capable of transmitting the COVID-19 virus; and (3) Defendants' testing program is an important safeguard – together with masking, social distancing, proper ventilation, appropriate sanitation, and other measures – to help ensure a safe classroom environment.  The testing program helps ensure the safety of the health of the children tested, their families and friends, their classmates, their classmates' family and friends, teachers and school staff, as well as the larger community.  While a test that could determine infectiousness would be preferable, no such test is currently available that could be administered on a mass, routine basis.

28

## II.   LEGAL RULINGS

### A.   Whether All Plaintiffs Have Standing

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'  For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."  Dep't of Com. v. New York, 139 S. Ct. 2551, 2565 (2019). To have Article III standing, "a plaintiff must [1] 'present an injury that is concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling.'"  Id. (citation omitted).

> At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment. Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts" that establish the "three familiar elements of standing[.]"

New York v. United States Dep't of Homeland Sec., 969 F.3d 42, 59 (2d Cir. 2020) (quoting Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011)).

Here, Defendants argue that Plaintiffs La Mazza and Children's Health Defense do not have standing.  (Def. Br. (Dkt. No. 17) at 14)

As to Plaintiff La Mazza – who is the parent of a fourth grader (see La Mazza Decl. (Dkt. No. 12-5) at ¶ 1) – Defendants point out that he, like 63% of parents of children in New York City public schools, chose remote learning for his child at the outset of the school year.  (Def Br. (Dkt. No. 17) at 15; see also Chou Decl. (Dkt. No. 18) ¶¶ 11-12)  Accordingly, public school closures, re-openings, and random testing requirements do not apply to La Mazza's son, who has received and will continue to receive 100% remote learning.  (Id.)  Plaintiffs have not responded to Defendants' arguments concerning La Mazza's lack of standing.  (See Pltf. Reply Br. (Dkt. No. 23))

29

Plaintiffs' moving papers include a declaration from La Mazza, however, in which he complains that "[t]he City of New York is requiring me to sign a [consent] to mandatory PCR testing for my son R.L., otherwise they will not let my son in school.  I refused to sign the consent form and my son R.L. was kicked out of P.S. 14."  (La Mazza Decl. (Dkt. No. 12-5) at ¶¶ 6-7)

La Mazza and the other Plaintiffs have alleged that Defendants' random testing program and the denial of in-person learning to those children whose parents refuse to provide consent to the testing program, violates numerous constitutional rights.  (See generally Pltf. Br. (Dkt. No. 12))  The Court concludes that, given these circumstances, La Mazza has standing to pursue his claims.  Dep't of Commerce, 139 S.Ct. at 2565.

As to Plaintiff Children's Health Defense,

> [t]o bring a Section 1983 suit on behalf of its members, an organization must clear two hurdles.  First, it must show that the violation of its members' rights has caused the organization to suffer an injury independent of that suffered by its members.  Second, it must 'demonstrat[e] a close relation to the injured third part[ies],' and 'a hindrance' to those parties' 'ability to protect [their] own interests.'"

N.Y. State Citizens' Coal. for Child. v. Poole, 922 F.3d 69, 74 (2d Cir. 2019) (citations omitted).

Children's Health Defense has not met the first hurdle.  The Amended Complaint contains no allegations suggesting that Children's Health Defense has suffered an injury as a result of the challenged conduct.  While the Amended Complaint states that the organization's "mission is to safeguard children's health and to advocate for children," (Am. Cmplt. (Dkt. No. 11) at ¶ 52) and that it "has active members in New York City, including parents of children named in this lawsuit," (id. at ¶ 54) these allegations do not suffice to demonstrate standing.

"[O]rganizations suing under Section 1983 must, without relying on their members' injuries, assert that their own injuries are sufficient to satisfy Article III's standing

requirements." Poole, 922 F.3d at 74-75.  Accordingly, "an organization must show that it has

suffered a 'perceptible impairment' to its activities.  This showing can be met by identifying

'some perceptible opportunity cost' that the organization has incurred because of the violation of

its members' rights." Id. at 75 (citations omitted).

Here, Children's Health Defense asserts in its brief that its "staff and volunteers

have spent hundreds of hours studying and responding to questions from members, including

Plaintiff Aviles, about Defendants' PCR testing regime and school closures."  (Pltf. Reply Br.

(Dkt. No. 23) at 15).  This assertion in a brief – unsupported by factual allegations in the

Amended Complaint or in a declaration – is not sufficient.  See United States Dep't of Homeland

Sec., 969 F.3d at 59.  The Court concludes that Children's Health Defense has not demonstrated

that it has standing to pursue its claims.

**B.      Whether Plaintiffs' Claims Are Moot**

As discussed at the outset, there are two prongs to Plaintiffs' claims.  They

contend that (1) all public schools should be reopened; and (2) Defendants should be enjoined

from requiring parental consent for random COVID-19 testing as a condition to in-person

instruction.  Given that (1) the individual Plaintiffs are parents of elementary and middle school

students (Am. Cmplt. (Dkt. No. 11) at ¶¶ 45-50; see also Aviles Decl. (Dkt. No. 12-3);

Kalikazaros Decl. (Dkt. No. 12-4); La Mazza Decl. (Dkt. No. 12-5); Lia Decl. (Dkt. No. 12-6);

Denaro Decl. (Dkt. No. 12-7)); and (2) Defendants have previously announced the reopening of

elementary schools, and reopened middle schools on February 25, 2021, Plaintiffs' claims

regarding the reopening of schools are moot.

"A case becomes moot when interim relief or events have eradicated the effects of

the defendant's act or omission, and there is no reasonable expectation that the alleged violation

will recur." Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 647 (2d Cir.

1998); see also Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (discussing

mootness and noting that dismissal is appropriate "if an event occurs while a case is pending . . .

that makes it impossible for the court to grant any effectual relief" (citation and quotation marks

omitted)).

New York City's elementary schools – and special education schools – were

reopened for in-person learning by December 10, 2020 (Varma Decl. (Dkt. No. 19) at ¶ 25), and

middle schools were reopened on February 25, 2021.  (Def. Feb. 22, 2021 Ltr., Ex. R (Dkt. No.

44-4) at 1)  Because Plaintiffs' children are elementary and middle school students (see Aviles

Decl. (Dkt. No. 12-3); Kalikazaros Decl. (Dkt. No. 12-4); La Mazza Decl. (Dkt. No. 12-5); Lia

Decl. (Dkt. No. 12-6); Denaro Decl. (Dkt. No. 12-7)), an order from this Court directing that the

New York City public schools be reopened would have no effect on them.  See Church of

Scientology, 506 U.S. at 12.  Accordingly, as to this issue, Plaintiffs' claims are moot.

There is a "narrow exception" to the mootness doctrine that applies where a

dispute "is capable of repetition, yet evading review."  Altman v. Bedford Ctr. Sch. Dist., 245

F.3d 49, 71 (2d Cir. 2001) (citation and quotation marks omitted); see id. ("A narrow exception

to the principle that a moot claim is to be dismissed, available only in exceptional situations, is

that the court may adjudicate a claim that, though technically moot, is capable of repetition, yet

evading review." (citations and quotation marks omitted)).  This exception

> applies only in exceptional situations, where the following two circumstances are
> simultaneously present:  (1) the challenged action is in its duration too short to be
> fully litigated prior to cessation or expiration, and (2) there is a reasonable
> expectation that the same complaining party will be subject to the same action
> again.

Spencer v. Kemna, 523 U.S. 1, 17 (1998) (citations, quotation marks, and alteration marks omitted).

Here, Plaintiffs' claims regarding the reopening of the public schools satisfy neither requirement.  The challenged actions have not been of short duration.  Indeed, the middle schools were closed for several months.  Moreover, it would be speculative for this Court to find that Defendants will again close elementary and middle schools for in-person learning. Accordingly, the individual Plaintiffs' claims regarding the reopening of public schools are moot.

**C.**     **Whether Plaintiffs Have Demonstrated a Right to Injunctive Relief**

**1.**     **Legal Standards**

"When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."  Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 631 (2d Cir. 2020) (citation and quotation marks omitted).  Moreover, where – as here –

> the movant is seeking to modify the status quo by virtue of a "mandatory preliminary injunction" (as opposed to seeking a "prohibitory preliminary injunction" to maintain the status quo), or where the injunction being sought "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant must also:  (1) make a "strong showing" of irreparable harm, and (2) demonstrate a "clear or substantial likelihood of success on the merits."

Yang v. Kosinski, 960 F.3d 119, 127-28 (2d Cir. 2020) (footnotes omitted) (emphasis in original); see also New York v. United States Dep't of Educ., 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020) ("A preliminary injunction is one of the most drastic tools in the arsenal

of judicial remedies. . . . When the moving party seeks an injunction that will affect

government action taken pursuant to a regulatory scheme, the plaintiffs must establish a

clear or substantial likelihood of success on the merits." (citations and quotation marks

omitted)).

2.      <u>Likelihood of Success</u>

a.      <u>Due Process Claims</u>

Plaintiffs allege that they and "their children have a fundamental right to a basic,

minimum education . . . and [a] fundamental right to literacy."  (Pltf. Br. (Dkt. No. 12) at 22)

According to Plaintiffs, Defendants have deprived them and their children "of the right to direct

education in violation of the Fourteenth Amendment, by effectively precluding children from

receiving education and literacy[,] because (1) many students have no or limited access to the

internet; (2) remote learning is demonstrably inferior; and (3) truancy demonstrably results in

such circumstances."  (<u>Id.</u> at 17 (citing Am. Cmplt., Ex. 17 (Dkt. No. 11-2) (McKinsey Report

entitled "COVID-19 and student learning in the United States:  The hurt could last a lifetime"));

<u>see</u> <u>id.</u> at 22)

i.      <u>Substantive Due Process</u>

"[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive

component that protects against certain government actions regardless of the fairness of the

procedures used to implement them."  <u>Bryant v. N.Y. State Educ. Dep't</u>, 692 F.3d 202, 217 (2d

Cir. 2012) (citation and quotation marks omitted).  To determine "whether a government rule or

regulation infringes a substantive due process right, the first step is to determine whether the

asserted right is fundamental, – <u>i.e.</u>, implicit in the concept of ordered liberty, or deeply rooted in

this Nation's history and tradition."  <u>Id.</u> (citation and quotation marks omitted).

34

In <u>Bryant</u>, the Second Circuit held that "[t]he right to public education is not fundamental."  <u>Bryant</u>, 692 F.3d at 217 (citing <u>Handberry v. Thompson</u>, 446 F.3d 335, 352 (2d Cir. 2006)).  Moreover, neither the Supreme Court nor the Second Circuit has found that there is a fundamental right to literacy.

Where, as here, "the right [allegedly] infringed is not fundamental, the governmental regulation need only be reasonably related to a legitimate state objective."  <u>Id.</u> (citation and quotation marks omitted).  As the Second Circuit recognized, that is a "low threshold."  <u>Id.</u> at 218.

Here, the Court has determined that Defendants' testing regime is reasonably related to a legitimate state objective – curbing the spread of the COVID-19 virus.  The Second Circuit has acknowledged that "stemming the spread of COVID-19 is unquestionably a compelling [governmental] interest."  <u>Agudath</u>, 983 F.3d at 633 (citation, quotation marks, and alteration marks omitted).  Moreover, remote learning is offered to those students whose parents refuse to consent to random testing.  Given these circumstances, the Court concludes that Plaintiffs have not demonstrated that they are likely to prevail on their substantive due process claim.  <u>See</u> <u>Bryant</u>, 692 F.3d at 217-18; <u>Brach v. Newsom</u>, No. 2:20-cv-06472-SVW-AFM, 2020 WL 6036764, at *1, 4-5 (C.D. Cal. Aug. 21, 2020) (denying temporary restraining order "seeking to enjoin the enforcement of California's school reopening framework, which prohibit[ed] in-person education in counties on a statewide COVID-19 monitoring list"; finding that there is no fundamental right to education and that plaintiffs were "unlikely to succeed on the merits of their substantive due process claim"; noting that "federal courts should exercise restraint" in areas such as public education, that are generally in "the control of state and local authorities" (citations and quotation marks omitted)).

ii.        **Procedural Due Process**

Plaintiffs contend that they have been deprived of a property right without due process.  (Pltf. Reply Br. (Dkt. No. 23) at 8-9)

"A procedural due process claim is composed of two elements:  (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process."  Bryant, 692 F.3d at 218.  "To prevail on a procedural due process claim, the plaintiff must demonstrate:  (1) that the plaintiff possessed a constitutionally protected interest, (2) that such interest was deprived as a result of government action, (3) and that the deprivation occurred without constitutionally adequate pre- or post-deprivation process."  D.C. by Conley v. Copiague Union Free Sch. Dist., No. 16-cv-4546 (SJF) (AYS), 2017 WL 3017189, at *8 (E.D.N.Y. July 11, 2017) (citation and quotation marks omitted).

The Supreme Court has acknowledged that where, based on state law, citizens have "legitimate claims of entitlement to a public education," "a student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause."  Goss v. Lopez, 419 U.S. 565, 573-74 (1975).  The Second Circuit has made clear, however, that there is no "property interest in any particular type of education program or treatment."  Bryant, 692 F.3d at 218; see id. (rejecting a procedural due process claim where the challenged policy did "not prevent . . . children from obtaining a public education, even if, as Plaintiffs allege, these children would receive a better education if aversive interventions were permitted") (emphasis in original).  Accordingly, "a student's procedural due process rights with respect to his or her education only arise where the student 'is excluded from the entire educational process.'"  D.C. by Conley, 2017 WL 3017189, at *9 (citation omitted).

Here, Plaintiffs have not shown that they are likely to prevail on their procedural

due process claim, because their children have not been "'excluded from the entire educational

process.'"  Id. (citation omitted).  Under Defendants' protocols, "[a]ll students who are

temporarily unable to obtain in-person instruction . . . are switched to 100% remote learning."

(Varma Decl. (Dkt. No. 19) at ¶ 33)  Any argument that Plaintiffs' children would receive a

better education in an in-person environment is not sufficient, under Bryant, to make out a

procedural due process claim.  Bryant, 692 F.3d at 218.[11]

**b.    Equal Protection Claim**

The "Equal Protection Clause requires that the government treat all similarly

situated people alike."  Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

> Although the prototypical equal protection claim involves discrimination against
> people based on their membership in a vulnerable class, [the Second Circuit] ha[s]
> long recognized that the equal protection guarantee also extends to individuals
> who allege no specific class membership but are nonetheless subjected to
> invidious discrimination at the hands of government officials.

Id.; see also Lopes v. Westchester Cnty., No. 18-CV-8205 (KMK), 2020 WL 7029002, at *7

(S.D.N.Y. Nov. 30, 2020) ("Where . . . a plaintiff does not claim to be a member of a

constitutionally protected class, he may bring an [e]qual [p]rotection claim pursuant to one of

two theories:  (1) selective enforcement, or (2) class of one.") (citations and quotation marks

omitted)); Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013)

(same).

---

[11] Plaintiffs' complaint that Defendants' "destruction [of test specimens] makes it impossible for
Plaintiffs to be heard to contest PCR findings" (Pltf. Reply Br. (Dkt. No. 23) at 9) does not
change the result.  Whether a child receives a positive or negative test result, no child "'is
excluded from the entire educational process.'"  D.C. by Conley, 2017 WL 3017189, at *9
(citation omitted).

Plaintiffs contend that Defendants have violated their rights to equal protection. (Pltf. Br. (Dkt. No. 12) at 21)  Acknowledging the applicability of rational basis review – which requires merely a "rational relationship to some legitimate end" (see id.) – Plaintiffs argue that "Defendants have not proven the rationality of school exclusions and forced medical testing." (Id. at 22)  In their reply brief, Plaintiffs go on to allege that "Defendants' actions have a disparate impact on Black and Hispanic children."  (Pltf. Reply Br. (Dkt. No. 23) at 10; see also Jan. 15, 2021 Pltf. Ltr. (Dkt. No. 33) at 5)

Plaintiffs' papers are devoid of any allegations regarding classifications, and their conclusory allegations as to the disparate impact of Defendants' actions and policies on Black and Hispanic children (see Pltf. Br. (Dkt. No. 12) at 8; Pltf. Reply Br. (Dkt. No. 23) at 10) are not sufficient to state an equal protection claim under either a "class of one" theory or a selective-enforcement theory.  See Vaher, 916 F. Supp. 2d at 433.

The actions Plaintiffs challenge have applied across-the-board to all New York City public school children.  The only classifications have been by grade-level or special needs. Moreover, as discussed above, Defendants' actions are reasonably and rationally related to the legitimate objective of curbing the spread of the COVID-19 virus.  Accordingly, Plaintiffs have not demonstrated a likelihood of success on their equal protection claim.  See Brach, 2020 WL 6036764, at *7 (rejecting plaintiffs' equal protection claim; noting that "[t]he Equal Protection Clause simply does not require that government classifications be supported by scientific consensus – or even the most reliable scientific evidence.  '[R]ational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data."'" (citation omitted)).

c.      **Parental Rights Claims**

Plaintiffs contend that "[p]arents have a fundamental right to direct the care and upbringing of their children, and medical decisions fall squarely within that liberty interest." (Pltf. Br. (Dkt. No. 12) at 19)  "Allowing unknown persons with unknown qualifications, at unspecified intervals, to give children intrusive medical tests is a cause of great concern to parents."  (Id. at 20)  Plaintiffs further argue that they have a "fundamental right to direct the education of their children and choose the type of education that they think is best."  (Id.)

The Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."  Troxel v. Granville, 530 U.S. 57, 66 (2000).  As to a child's education, however, Supreme Court jurisprudence does "not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught."  Leebaert v. Harrington, 332 F.3d 134, 141 (2d Cir. 2003).  And while the Second Circuit has acknowledged that "[p]arents . . . have a liberty interest . . . in the upbringing of their children," and "definite rights over their children's education, 'they have no constitutional right to provide their children with . . .  education unfettered by reasonable government regulation.'"  Immediato v. Rye Neck Sch. Dist., 73 F.3d 454, 461 (2d Cir. 1996) (citation omitted) (emphasis in original).

Here, the Court concludes that there is no fundamental parental right to dictate to a school district – in the midst of a global pandemic the likes of which has not been seen in more than a hundred years – whether classes should be conducted remotely or in-person.  For reasons already stated, the Court finds that Defendants' actions have been reasonable under the circumstances.  As the Brach court noted,

the manner of providing public education is "generally committed to the control
of state and local authorities."  [Fields v. Palmdale Sch. Dist., 427 F.3d 1197,

1206 (9th Cir. 2005)]  Plaintiffs' proposed constitutional right would at least
unsettle "local autonomy" in public education, which the Supreme Court has
described as "a vital national tradition."  Missouri v. Jenkins, 515 U.S. 70, 99
(1995) (citation omitted); see also Horne v. Flores, 557 U.S. 433, 448 (2009)
(internal citations omitted) (noting that federal courts should exercise restraint in
imposing injunctions "involv[ing] areas of core state responsibility, such as public
education").

Brach, 2020 WL 6036764, at *5.

As to Plaintiffs' challenge to Defendants' random testing program, it is

undisputed that parents have a right to make medical decisions for their children.  See, e.g.,

Parham v. J.R., 442 U.S. 584, 604 (1979) ("The fact that a child may balk at hospitalization or

complain about a parental refusal to provide cosmetic surgery does not diminish the parents'

authority to decide what is best for the child.").  But that right is not absolute.  See, e.g., Phillips

v. City of New York, 775 F.3d 538, 542-43 (2d Cir. 2015) (per curiam) (rejecting plaintiffs'

claim "that New York's mandatory vaccination requirement violates substantive due process" as

"foreclosed" by Supreme Court precedent holding that "mandatory vaccination [is] within the

State's police power"); see also van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d

863, 866-68 (2d Cir. 1990) (state caseworker arranged for a child to receive x-ray examination

but did not obtain parental consent; court concluded that such action was not permissible "unless

a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that

grounds for such an examination exist and that the administration of the procedure is reasonable

under all the circumstances").

Here, Defendants' protocols require parental consent before a COVID-19 test can

be administered to a student.  (Varma Decl. (Dkt. No. 19) at ¶ 49)  Should parents refuse to sign

the consent form, their child will receive remote learning from their school.  (Id.)  Accordingly,

no school official will perform medical tests on a child without parental consent.  Moreover,

those parents who provide written consent are given notice of the intent to test their child, and

are allowed to retract their consent at any time.  (Id. at ¶¶ 51, 56)  Also, any child for whom

parental consent has been provided but who is nonetheless uncomfortable with the test can state

as much and will not be tested.  (Id. at ¶ 55; see also id. at ¶¶ 50-56)

   Given these circumstances and safeguards, this Court concludes that Plaintiffs

have not demonstrated a likelihood of success on their parental rights claims.

### d. Unlawful Search and Privacy Claims

   Plaintiffs assert that Defendants' random testing program constitutes an

unreasonable search and seizure under the Fourth Amendment.  (Pltf. Br. (Dkt. No. 12) at 16)

According to Plaintiffs, "[a] nasal swab . . . requires a warrant in the absence of voluntary

informed consent."  (Pltf. Reply Br. (Dkt. No. 23) at 11)

   The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const.

amend. IV.  The Fourth Amendment's guarantee has been extended "to searches and seizures by

state officers, including public school officials."  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646,

652 (1995) (citations omitted).

   For purposes of analyzing Plaintiffs' Fourth Amendment claim, this Court

assumes that Defendants' nasal swab random testing program constitutes a search.

   In Vernonia School District 47J, the Supreme Court considered a school district's

"Student Athlete Drug Policy . . . [that] authorize[d] random urinalysis drug testing of students

who participate[d] in the District's school athletics programs."  515 U.S. at 648.  "Students

wishing to play sports [had to] sign a form consenting to the testing and [had to] obtain the

written consent of their parents."  Id. at 650.  Previously, the Supreme Court had "held that state-

compelled collection and testing of urine" constituted a search "subject to the demands of the

Fourth Amendment." <u>Id.</u> at 652 (citation omitted).  Accordingly, the Supreme Court assessed the

school district's random drug testing program by applying the "ultimate measure [for

determining] the constitutionality of a governmental search" – "'reasonableness.'" <u>Id.</u>

   In determining whether the school district's drug testing program was reasonable,

the Supreme Court balanced the search's "intrusion on the individual's Fourth Amendment

interests against [the search's] promotion of legitimate governmental interests." <u>Id.</u> at 653

(citation and quotation marks omitted).  The Court noted that although searches to "discover

criminal wrongdoing" "generally require[]" a "judicial warrant" to be reasonable – and a

showing of probable cause – "[a] search unsupported by probable cause [and a warrant] can be

constitutional" where "'special needs'" are present. <u>Id.</u> (citation omitted); <u>see</u> <u>also</u> <u>Cassidy v.</u>

<u>Chertoff</u>, 471 F.3d 67, 74-75 (2d Cir. 2006) (collecting cases upholding "warrantless,

suspicionless searches in a variety of circumstances in which the government's actions were

motivated by 'special needs'").

   The Supreme Court has "found such 'special needs' to exist in the public school

context." <u>Vernonia Sch. Dist.</u>, 515 U.S. at 653.  In determining whether "special needs" are

present, courts should consider (1) "the nature of the privacy interest upon which the search . . .

at issue intrudes," <u>id.</u> at 654; (2) "the character of the intrusion that is complained of," <u>id.</u> at 658;

and (3) "the nature and immediacy of the governmental concern at issue, and the efficacy of [the]

means for meeting [that concern]." <u>Id.</u> at 660; <u>see</u> <u>also</u> <u>Cassidy</u>, 471 F.3d at 75 (same).

   As to the first factor – the nature of the privacy interest intruded upon – the

Supreme Court noted that

> Fourth Amendment rights . . . are different in public schools than elsewhere; the
> "reasonableness" inquiry cannot disregard the schools' custodial and tutelary
> responsibility for children.  For their own good and that of their classmates, public
> school children are routinely required to submit to various physical examinations,

and to be vaccinated against various diseases.  According to the American
Academy of Pediatrics, most public schools "provide vision and hearing
screening and dental and dermatological checks. . . . Others also mandate scoliosis
screening at appropriate grade levels."  Committee on School Health, American
Academy of Pediatrics, School Health: A Guide for Health Professionals 2
(1987).  In the 1991-1992 school year, all 50 States required public school
students to be vaccinated against diphtheria, measles, rubella, and polio.  U.S.
Dept. of Health & Human Services, Public Health Service, Centers for Disease
Control, State Immunization Requirements 1991–1992, p. 1.  Particularly with
regard to medical examinations and procedures, therefore, "students within the
school environment have a lesser expectation of privacy than members of the
population generally."  [New Jersey v. T.L.O., 469 U.S. 325, 348 (1985) (Powell,
J., concurring).

Id. at 656-57.

Accordingly, "while children . . . do not shed their constitutional rights . . . at the

schoolhouse gate," their rights are nonetheless different in the schoolhouse.  Id. at 656 (citation

and quotation marks omitted).

Here, New York City public school children and their parents have been

presented with the following options:  (1) sign a consent form for in-school COVID-19 testing

and receive in-person instruction; or (2) do not sign the consent form and receive remote-

learning instruction.  (Varma Decl. (Dkt. No. 19) ¶ 49)

As to the first factor of the Vernonia School District analysis – "the nature of the

privacy interest upon which the search . . . intrudes," 515 U.S. at 654 – Defendants' random

testing program involves a medical examination or procedure.  As discussed above, parents are

generally responsible for making medical decisions concerning their child.  As in Vernonia

School District, however, the nasal swab test has been designed for the student's "own good and

that of their classmates."  Id. at 656.  The nasal swab test also takes place "'within the school

environment [where students] have a lesser expectation of privacy than members of the

population generally.'"  Id. at 657 (citation omitted).  And as in Vernonia School District,

Defendants' testing program is premised on parental consent – consent that may be withdrawn at any time.  (Id. at 650; see also Varma Decl. (Dkt. No. 19) ¶¶ 49-51)

As to the second factor – "the character of the intrusion that is complained of" – the Court finds that the intrusion is minimal in nature.  The testing program involves use of a short nasal swab; the test is performed in a matter of seconds; is not painful; and does not involve "[a body part or] function traditionally shielded by great privacy."  See id. at 685 (citation and quotation marks omitted).  As discussed above, parental consent is required for testing; a parent may seek exemption from testing; parents are given two-days' notice of the test; and no child will be tested against their will.  (Varma Decl. (Dkt. No. 19) ¶¶ 49-50, 55-56)  As to confidentiality, access to individual test results is tightly restricted, and specimens are destroyed after testing is completed.  (Id. ¶¶ 57-61)

The third Vernonia School District factor is "the nature and immediacy of the governmental concern at issue, and the efficacy of [the] means for meeting [that concern]."  515 U.S. at 660.  Here, "the nature and immediacy of the governmental concern" could hardly be more compelling.  The random testing program is designed to control the spread of the COVID-19 virus in schools and in the larger community.[12]  (See Varma Decl. (Dkt. No. 19) ¶¶ 5-21, 44, 46)  Moreover, in such circumstances, public officials are not required to demonstrate that the search at issue is the "'least intrusive'" means available.  Vernonia School Dist., 515 U.S. at 663 (citation omitted).  Indeed, the Supreme Court stressed in Vernonia School District that it has

---

[12]  Although the governmental interest here is compelling, in Vernonia School District, the Supreme Court instructed that public officials are not required to demonstrate a "compelling" interest in the Fourth Amendment context.  515 U.S. at 661.  Instead, the appropriate inquiry is whether the governmental interest is "important enough to justify the particular search at hand."  Id. (emphasis in original).  The circumstances of the COVID-19 pandemic are "important enough" to justify the administration of the random nasal swab test in the New York City public schools.

"repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."  Id. (citation omitted).

As to the efficacy of the random testing program to detect the presence of the COVID-19 virus in the schools, as this Court has found, Defendants' PCR test is the most reliable tool currently available for this purpose.  While the PCR test does not reveal infectiousness, as this Court has explained, no such test can be made widely available at this time.

Having considered all of the Vernonia School District factors, the Court concludes that they demonstrate that Defendants' random testing program is reasonable.  Accordingly, Plaintiffs' have not shown a likelihood of success on their Fourth Amendment and privacy claims.

### e.   <u>Unconstitutional Conditions Doctrine</u>

Plaintiffs contend that Defendants' random testing program violates the unconstitutional conditions doctrine.  (Pltf. Br. (Dkt. No. 12) at 21)

> Pursuant to [the] "unconstitutional conditions" doctrine, . . . the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance.

All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 231 (2d Cir. 2011), aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205 (2013).

Contrary to Plaintiffs' claim, access to a public school education may be conditioned on parental consent to various medical tests and procedures.  For example, it is well established that a state may require vaccination as a condition to attending public school.  See, e.g., Zucht v. King, 260 U.S. 174, 176 (1922) (stating that it is "settled that it is within the police

power of a state to provide for compulsory vaccination"); <u>Phillips</u>, 775 F.3d at 540, 543

(rejecting parents' challenge to New York state requirement that all children be vaccinated in

order to attend public school; "New York could constitutionally require that all children

be vaccinated in order to attend public school.  New York law goes beyond what the Constitution

requires by allowing an exemption for parents with genuine and sincere religious beliefs.

Because the State could bar [the] . . .  children from school altogether, <u>a fortiori</u>, the State's more

limited exclusion during an outbreak of a vaccine-preventable disease is clearly constitutional.");

<u>Whitlow v. California</u>, 203 F. Supp. 3d 1079, 1091 (S.D. Cal. 2016) ("conditioning school

enrollment on vaccination has long been accepted by the courts as a permissible way for States to

innoculate large numbers of young people and prevent the spread of contagious diseases").

   While Defendants' random COVID-19 testing program is (1) not a vaccination,

and (2) is administered pursuant to an Emergency Use Authorization,[13] there are significant

parallels between the testing and vaccination programs.  For example, both programs are

administered in the school environment, are designed to curb the spread of disease, and offer

parents an opportunity to seek an exemption.  The nasal swab testing program places

significantly less serious burdens on parents and children, however, because (1) it is premised on

parental consent, and remote learning is offered to those children whose parents do not consent;

and (2) unlike vaccines, the nasal swab test presents little to no risk of serious side effects.

   This Court concludes that Plaintiffs have not demonstrated that they are likely to

prevail on their unconstitutional conditions doctrine claim.

*  *  *  *

---

[13]  Plaintiffs contend that PCR tests are Emergency Use Authorization products, and that use of such products cannot be made mandatory.  (Pltf. Br. (Dkt. No. 33) at 2 (citing 21 U.S.C. §360bbb-3))  As discussed above, Defendants' random testing program is premised on parental consent.  (Varma Decl. (Dkt. No. 19) at ¶ 49)

46

Because Plaintiffs have not demonstrated a likelihood of success on any of their claims, their application for a preliminary injunction will be denied.[14]

## **CONCLUSION**

For the reasons stated above, Plaintiffs' motion for a preliminary injunction (Dkt. No. 12) is denied.  The Clerk of Court is directed to terminate the motion (Dkt. No. 12).

Plaintiffs will submit a letter to this Court by **March 9, 2021** setting forth how they wish to proceed in light of this Opinion.

Dated:  New York, New York
        March 2, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[14]  Plaintiffs' motion for judicial notice (Dkt. No. 13) is denied as moot.  The Federal Rules of Evidence do not apply to Plaintiffs' motion, see Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010); Gov't Emps. Ins. Co. v. Wellmart RX, Inc., 435 F. Supp. 3d 443, 455 (E.D.N.Y. 2020); Zeneca Inc. v. Eli Lilly & Co., No. 99 CIV. 1452 (JGK), 1999 WL 509471, at *2 (S.D.N.Y. July 19, 1999), and the Court has considered all of the documents submitted by the parties in rendering its decision.  The Clerk of Court will terminate the motion (Dkt. No. 13).